IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

FRED A. BAKER,                        §
                                      §
          Plaintiff,                  §
                                      §
v.                                    §        CIVIL NO. H-05-409
                                      §
JO ANNE B. BARNHART,                  §
COMMISSIONER OF THE                   §
SOCIAL SECURITY ADMINISTRATION        §
                                      §
          Defendant.                  §

## MEMORANDUM OPINION

Pending before the court[1] are Defendant's Motion for Summary Judgment (Docket Entry No. 14) and Plaintiff's Cross-Motion for Summary Judgment (Docket Entry No. 16).  The court has considered the motions, all relevant filings, and the applicable law.  For the reasons set forth below, the court **DENIES** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Cross-Motion for Summary Judgment.

## I.  Case Background

### A.   Procedural History

In this action, Fred A. Baker ("Plaintiff") seeks review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for a period of disability, disability insurance benefits and

---

[1]    The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  See Docket Entry Nos. 11-13.

supplemental security income under Title II and Title XVI of the Social Security Act ("the Act").  Plaintiff initially filed his application on March 3, 2000.[2]  In the application, Plaintiff claimed an inability to work since March 3, 1997,[3] due to back pain and depression.[4]  After Plaintiff's application was denied at the initial and reconsideration levels, he requested a hearing before an Administrative Law Judge of the Social Security Administration ("ALJ").[5]  The ALJ granted Plaintiff's request and conducted a hearing in Houston, Texas, on March 2, 2004.[6]  After listening to testimony presented at the hearing and reviewing the medical record, the ALJ issued an unfavorable decision on April 20, 2004.[7] The ALJ found Plaintiff was not disabled at any time during the period covered by his application because he could still perform certain sedentary work that existed in significant numbers in the

---

[2]      Administrative Transcript ("Tr.") 75-78.

[3]      Id.  The ALJ stated in his decision that Plaintiff previously filed an application for disability insurance benefits on June 1, 1998, which was denied by an ALJ decision on March 3, 2000.  Plaintiff sought review of the ALJ decision, but the Appeals Council concluded there was no basis for review.  The ALJ noted that the doctrine of res judicata applied through the date of the first ALJ decision.  Accordingly, although the Plaintiff alleged disability since March 3, 1997, the ALJ decision addressed the period of time from March 2, 2000, to the present.  Tr. 18.

[4]      Id.

[5]      Tr. 18.

[6]      Id.  The hearing transcript indicates in error that the hearing was held in Dallas, Texas.  Tr. 529-562.

[7]      Tr. 18-28.

national economy.[8]  Subsequently, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner.[9]  Having exhausted his administrative remedies,[10]  Plaintiff brought this timely civil action for review of the Commissioner's decision, pursuant to 42 U.S.C. § 405(g).[11]

**B.   Factual History**

  **1.   Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on November 9, 1957, and is now forty-eight years of age.[12]  He has an eighth grade education and no special job training.[13]  Plaintiff's past relevant work experience involves employment as a warehouseman, color technician, bartender, security guard and forklift operator.[14]  Plaintiff has not engaged in any work since the date of his injury on March 3, 1997.[15]

_____

[8]    Id.

[9]    Tr. 5-7.

[10]   See Harper v. Bowen, 813 F.2d 737, 739 (5th Cir. 1987), for a summary of the administrative steps a disability claimant must take in order to exhaust his administrative remedies.

[11]   Plaintiff's Original Complaint, Docket Entry No. 1.

[12]   Tr. 75.  Plaintiff was 46 years of age at the time of the hearing, but is now 48.  Tr. 542.

[13]   Tr. 542.  It is noteworthy that Plaintiff also received a general equivalency diploma ("GED").  Tr. 543.

[14]   Tr. 19, 543-44.

[15]   Tr. 543.

### 2.    Plaintiff's Medical Evidence

Plaintiff's medical evidence of record reflects that, on March 3, 1997, Plaintiff was injured while he was working as a forklift operator.[16]   Specifically, Plaintiff was unloading several sacks weighing approximately one hundred and ten pounds when the forklift that he was operating slammed into a platform.[17]   The sacks fell onto Plaintiff, causing his body to get caught on a conveyor belt and resulting in extensive injury to his right leg and hip.[18]   Ten days after the accident, a company physician, Dr. N. Keshwani, M.D., concluded that Plaintiff had lumbar spine injury and recommended that he attend physical therapy sessions for a period of two weeks.[19]

On July 31, 1997, motor studies conducted during a physical examination showed evidence of bilateral L5 radiculopathy.[20]   On September 8, 1997, Plaintiff was examined at the River Oaks Imaging Diagnostic Center, where the physicians noted that he was alert, cooperative and well-oriented.[21]   In addition, Plaintiff's physical evaluation indicated that his deep tendon reflexes were at 2+, his

---

[16]    Tr. 540, 545.

[17]    Tr. 146, 545.

[18]    Id.

[19]    Tr. 146.

[20]    Tr. 19.

[21]    Tr. 156-58.

lower extremities were essentially normal and his bulk strength testing revealed 5/5 for all muscles tested.[22] On October 14, 1997, MRI studies of Plaintiff's lumbar spine showed mild bilateral L5/S1 facet osteoarthropathy, with a subtle bilateral facet osteoarthropathy at L4/L5 and on the right at L3/L4.[23]

Jeffrey H. Charnov, M.D. ("Dr. Charnov"), examined the Plaintiff on a continuous basis throughout 1998.[24] On January 8, 1998, Plaintiff visited Dr. Charnov with complaints of lower back pain radiating to the legs and towards the upper back.[25] Dr. Charnov noted that Plaintiff had a slow gait with some shuffling of his feet due to pain and that Plaintiff was able to walk on his toes for approximately four steps.[26] He further noted that Plaintiff's straight leg raise examination was positive for back pain and that the Plaintiff had to pause several times during the examination due to his severe back pain.[27] On March 5, 1998, Dr. Charnov noted that Plaintiff was unable to arrive to two scheduled facet joint injections due to transportation issues.[28] On May 28, 1998, Dr. Charnov reported that Plaintiff was treated with lumbar

---

[22]    Id.

[23]    Tr. 153-54.

[24]    Tr. 175.

[25]    Tr. 185-88.

[26]    Id.

[27]    Id.

[28]    Tr. 183-84.

facet joint injections and sacroiliac joint blocks two weeks prior to the visit, and that the injections appeared to have minimized Plaintiff's back discomfort.[29]

On January 19, 1999, the results of an MRI of Plaintiff's lumbar spine were normal.[30]  A progress note dated June 15, 1999, indicated that Plaintiff experienced problems with his gait and that he had tender spots on the back, sacroiliac area and coccygeal area.[31]  The note further indicated that Plaintiff's condition had not improved due to a lack of medications.[32]  A progress note dated May 20, 1999, likewise stated that Plaintiff's condition was worsening because his insurance company refused to render payment for his medications.[33]  On June 17, 1999, EMG studies showed L5 radiculopathy.[34]  On October 26, 1999, Plaintiff was reported to be reacting well to new medications.[35]

In 2000, Plaintiff was treated extensively for his back pain and depression at the Veterans Affairs Medical Center ("VAMC").  A progress note dated January 20, 2000, stated that Plaintiff "walks

---

[29]     Tr. 175.

[30]     Tr. 192-93.

[31]     Tr. 205.

[32]     Id.

[33]     Tr. 206.

[34]     Tr. 203-04.

[35]     Tr. 198.

with a limp and moves slowly, sometimes touching his back."[36]   On January 24, 2000, Plaintiff admitted that, prior to his hospitalization, he used crack cocaine and alcohol after a seven-year period of sobriety.[37]   With respect to his back pain, on February 4, 2000, Plaintiff complained that he had pain when he walked on his heals and toes.[38]   The test results indicated that Plaintiff had point tenderness pain with a straight leg raise, 5/5 strength in his lower extremities and decreased sensation in his right leg.[39]   On March 21, 2000, MRI results of Plaintiff's lumber spine were normal.[40]   On April 9, 2000, Plaintiff checked himself into the emergency room at the VAMC with complaints of severe lower back pain.[41]   A progress note on that same day stated that Plaintiff's affect was constricted and his mood dysphoric, but that he had fair insight and judgment, and his concentration and memory were normal.[42]   On June 8, 2000, a psychiatry outpatient note stated that Plaintiff ambulated slowly with a cane.[43]   Three days later, Plaintiff reported that he could only stand for a period of thirty

---

[36]   Tr. 240.

[37]   Tr. 229, 238.

[38]   Tr. 220.

[39]   Id.

[40]   Tr. 216.

[41]   Tr. 212-14.

[42]   Tr. 217.

[43]   Tr. 210.

7

minutes at a time.[44]

On July 26, 2000, Dr. Elaine Staton ("Dr. Staton") examined Plaintiff at the request of the Social Security Administration ("SSA").[45]   During that consultation, Plaintiff complained of constant back pain and recurring depression.[46]  He stated that he was wearing a back brace and using a cane, but was able to perform light housework, light cooking and light laundry.[47]  Dr. Staton found that Plaintiff had a flattened lordotic curve, a prominent right-sided limp, and a decreased range of motion to flexion, extension, and lateral flexion.[48]  Dr. Staton noted that Plaintiff could not squat or walk on his heels and toes.[49]  Dr. Staton further reported that, despite these limitations, Plaintiff showed no evidence of back spasms or muscular atrophy, his muscle strength was 5/5 in all major muscle groups, his fine gross manipulations were intact, his senses were responsive to light touch, pin prick and position sense, and his corrected vision was 20/25.[50]  Dr. Staton opined that Plaintiff was able to sit and stand for short periods of time, walk short distances, lift light weight and handle

---

[44]   Tr. 125.

[45]   Tr. 20, 269-72.

[46]   Tr. 269-72.

[47]   Id.

[48]   Id.

[49]   Id.

[50]   Id.

objects without difficulty.[51]

On August 25, 2000, Plaintiff was treated at the Mental Health Mental Retardation Authority of Harris County ("MHMRA"), where he was diagnosed with major depressive disorder.[52]   He reported symptoms of anhedonia, sleep disturbance, appetite disturbance, decreased energy, feelings of worthlessness, thoughts of suicide and increased anxiety.[53]   A MHMRA treatment note dated January 5, 2001, stated that Plaintiff's motor activity was normal, he had no suicidal ideation, his thought process was coherent and organized, and he had fair insight and judgment.[54]   From February through August of 2001, the treatment notes at MHMRA indicated that Plaintiff had no suicidal ideation, that he had organized and coherent thought processes, that he was attending computer school and that his motor activity was normal.[55]   On November 2, 2001, Plaintiff stated that his back pain was increasing in severity.[56] Later that month, he was using a cane and a walker was ordered to assist him in ambulation.[57]   A treatment note dated November 29, 2001, indicated that Plaintiff was unable to effectively walk with

---

[51]   Id.

[52]   Tr. 320-21.

[53]   Tr. 329.

[54]   Id.

[55]   Tr. 20.

[56]   Tr. 399.

[57]   Tr. 390.

a cane.[58]    On December 5, 2001, MRI studies showed minor degenerative changes in the lumbar spine.[59]   Chest x-rays performed on April 16, 2002, showed no acute disease.[60]

On January 1, 2003, Plaintiff checked into the emergency room with complaints of back pain and smoke inhalation.[61]    He was diagnosed with mild asthma, alcohol abuse and back pain.[62]   On March 11, 2003, Plaintiff's overall psychological functioning was rated at eight to nine on a scale of one to ten.[63]   Plaintiff's overall psychological functioning was likewise rated as an eight to nine one month later.[64]   On March 17, 2003, Plaintiff attended a smoking cessation class, where he admitted that he had been smoking for thirty years and was currently smoking half a pack of cigarettes a day.[65]

On August 20, 2003, Plaintiff was examined by psychologist Dr.

---

[58]    Id.

[59]    Tr. 388.

[60]    Tr. 373.

[61]    Tr. 363-64.

[62]    Id.

[63]    Tr. 21.  Plaintiff's anxiety was rated at three, insomnia was rated at two and depression was rated at one.  All other symptoms were rated at zero.

[64]    Id.  On this occasion, Plaintiff's anxiety was rated at 2, insomnia was rated at three, anxiety was rated at two, depression was rated at three and psychosis was rated at two.  All other symptoms were rated at zero.

[65]    Tr. 355.

Larry Pollock ("Dr. Pollock").[66]  Plaintiff told Dr. Pollock that he had attempted suicide after separating from his wife and reported feelings of helplessness, lack of interest, low energy, insomnia, decreased appetite and poor concentration.[67]  Dr. Pollock noted that Plaintiff ambulated with the aid of a walker.[68]  Dr. Pollock found that Plaintiff's attention span was good, that he functioned in the low to average range of intelligence,[69] and that his academic functioning was average to moderately deficient.[70]  Dr. Pollock diagnosed Plaintiff with major depressive disorder and disorder of written expression.[71]  Dr. Pollock further reported that Plaintiff had a good ability to follow work rules and to understand, remember and carry out simple job instructions.[72]  Plaintiff likewise had a fair ability to relate to co-workers and supervisors, to deal with the public and use his judgment, to function independently and maintain attention in concentration, to behave in an emotionally stable manner, to relate predictably in

---

[66]   Tr. 336-44.

[67]   Id.

[68]   Id.

[69]   Id. Plaintiff obtained a performance I.Q. of 84, a verbal I.Q. of 84 and a full scale I.Q. of 84.

[70]   Id.

[71]   Id.

[72]   Id.

social situations and to demonstrate reliability.[73]  Finally, Dr. Pollock found that Plaintiff had a poor ability to deal with work stress.[74]  By letter dated February 10, 2004, Plaintiff's physician, Dr. Nadeema Akhtar ("Dr. Akhtar") informed Social Services that Plaintiff was unable to work due to his depressive symptoms and anxiety.[75]

### 3.   Administrative Hearing Testimony

At the administrative hearing conducted on March 2, 2004, Plaintiff, a medical expert ("ME") and a vocational expert ("VE") testified.  Plaintiff first recounted how he was injured on the job.[76]  He then testified that since the time of his injury, he has experienced back pain and "cannot think straight."[77]  Plaintiff stated that MHMRA was paying for a caregiver to come to his home in order to assist him with dressing himself, cleaning the home and shopping.[78]  He explained that the MHMRA funds ran out approximately two or three years ago, but that his mother and his sister now assist him with household chores and with grocery shopping.[79]

---

[73]   Id.

[74]   Id.

[75]   Tr. 487.

[76]   Tr. 544-45.

[77]   Tr. 546.

[78]   Tr. 545-46

[79]   Id.

Plaintiff also stated that he no longer has control of his urination and bowel movements, and that he had "accidents" on a few occasions during the course of every week.[80]

Plaintiff testified that he can usually sit for approximately twenty minutes before he begins to experience back pain and that he spends a few hours of each day lying down.[81]  Plaintiff indicated that he has had difficulty walking, standing and sitting since the date of his injury, and that his condition has worsened over time.[82] Plaintiff admitted that the medications that he takes for his psychological problems make him feel better.[83]  Finally, Plaintiff opined that he could not perform his past work anymore because of his medical condition.[84]

After Plaintiff concluded his testimony, the ME, Dr. Glenn Sternes ("Dr. Sternes"), testified.  After analyzing Dr. Pollock's psychological evaluation of the Plaintiff, Dr. Sternes testified that Plaintiff was capable of performing simple work, but opined that with respect to detailed work, "there would have to be limits placed on concentration and pace."[85]  The ME made clear that he was

---

[80]    Tr. 547–48.

[81]    Tr. 548–49.

[82]    Tr. 547.

[83]    Tr. 549–50.

[84]    Tr. 545.

[85]    Tr. 555.

testifying only with respect to Plaintiff's psychological and psychiatric limitations and, therefore, not opining on Plaintiff's physical limitations.[86]

Subsequent to the testimony of the ME, the VE, Kay Gilreath ("Ms. Gilreath"), testified.   Ms. Gilreath first classified Plaintiff's past job as a warehouse worker as medium, semi-skilled work; his past job as a security guard as light, semi-skilled work; his past job as a color technician when he was tinting caulk as a medium to heavy, semi-skilled work; and his past work as a bartender as light to medium, semi-skilled work.[87]   In response to a hypothetical question from the ALJ, the VE opined that Plaintiff could not perform his past work and that Plaintiff had no transferable skills.[88]   The VE then found that Plaintiff's RFC allowed him to perform several other sedentary, unskilled jobs existing in significant numbers in the national economy.[89] Specifically, the VE identified the jobs of cashier, ticket seller and order clerk.[90]   After noting that Dr. Pollock concluded that Plaintiff had a poor ability to handle work stress, Plaintiff's attorney questioned the VE with respect to whether this would have

---

[86]     Tr. 556.

[87]     Tr. 556-57.

[88]     Tr. 557-58.

[89]     Tr. 558.

[90]     Id.

an affect on Plaintiff's ability to perform sedentary work.[91]   The VE admitted that "if a person has a poor ability for work stress and it almost rules out any jobs because there's always stress associated with work."[92]

## II.  Legal Standards

### A.   Standard of Review

This Court's review of a final decision by the Commissioner denying disability benefits is limited to determining (1) whether substantial record evidence supports the decision and (2) whether the ALJ applied proper legal standards in evaluating the evidence. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

If the findings of fact contained in the Commissioner's decision are supported by substantial evidence, they are conclusive, and this Court must affirm.  Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)); it is "more than a mere scintilla, and less than a preponderance."  Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir.

---

[91]    Tr. 560.

[92]    Id.

1993).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Under this standard, the Court must review the entire record but may not reweigh the record evidence, determine the issues de novo, or substitute its judgment for that of the Commissioner.  <u>Brown</u>, 192 F.3d at 496.

**B.   Standard to Determine Disability**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Specifically, under the legal standard for determining disability, the claimant must prove he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can expect to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan</u>, 38 F.3d at 236.  The existence of such disability must be demonstrated by "medically acceptable clinical and laboratory diagnostic findings."  42 U.S.C. §§ 423(d)(3), (d)(5); <u>see also</u> <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is disabled under this standard, Social Security Act regulations ("regulations") provide

that a disability claim should be evaluated according to a sequential five-step process:

> (1) An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

> (2) An individual who does not have a "severe impairment" will not be found to be disabled.

> (3) An individual who meets or equals a listed impairment in Appendix 1 of the regulations, 20 C.F.R. Pt. 404, Subpt. P ["Listings"], will be considered disabled without the consideration of vocational factors.

> (4) If an individual is capable of performing the work he has done in the past, a finding of "not disabled" will be made.

> (5) If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520. The claimant bears the burden of proof on the first four steps of the inquiry, while the Commissioner bears it on the fifth. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999); Brown, 192 F.3d at 498. The Commissioner can satisfy this burden either by reliance on the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. Fraga v. Bowen, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner satisfies her step-five burden of proof, the burden shifts back to the claimant to prove he cannot perform the work suggested. Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir.

17

1991).   The analysis stops at any point in the process upon a conclusive finding that the claimant is disabled or not disabled. <u>Greenspan</u>, 38 F.3d at 236.

### III.   <u>Analysis</u>

In his formal decision, the ALJ first noted that Plaintiff had met the disability insured status requirements of the Act from the alleged onset date of disability through the date of the decision.[93] The ALJ then followed the five-step process outlined in the regulations, finding at the first step that Plaintiff had not engaged in any substantial gainful activity since his alleged onset date of disability.[94]   At step two, the ALJ found that Plaintiff's anxiety, major depressive disorder, disorder of written expression, chronic obstructive pulmonary disease, and minor degenerative disc disease of the lumbar spine with radiculopathy were severe impairments.[95]   However, at step three, the ALJ determined these impairments were not of a severity sufficient to meet or equal one of the Listings, and therefore were not presumptively disabling under the Act.[96]

The ALJ then took into consideration the information contained in Plaintiff's medical records, as well as testimony presented at

---

[93]     Tr. 26.

[94]     Tr. 22-23.

[95]     Tr. 27.

[96]     <u>Id.</u>

the hearing, and concluded at step four that Plaintiff retained a residual functional capacity ("RFC") to perform a significant range of sedentary work.[97]  Specifically, the ALJ determined Plaintiff was capable of lifting five pounds frequently and ten pounds occasionally, but was unable to climb stairs, ropes, ladders or scaffolds, and required the use of a walker to ambulate.[98]  He further concluded that Plaintiff could stand for thirty minutes at a time for a total of six hours, walk for a few moments at a time for a total of one hour and sit for thirty minutes at a times for a total of six hours.[99]  The ALJ noted that Plaintiff should be limited to a simple, routine work environment, and cannot perform tasks that require exposure to pollutants, dust, gases and mists, due to his chronic pulmonary disease.[100]  Based on Plaintiff's RFC, the ALJ concluded that Plaintiff could not perform his past relevant work.[101]

Proceeding to the final step, the ALJ found that, based on Plaintiff's age, education, past vocational experience, and RFC, Plaintiff was still capable of performing certain jobs that existed

---

[97]    Tr. 18-19, 21.

[98]    Tr. 27.

[99]    Id.

[100]   Id.

[101]   Id.

in significant numbers in the local and national economies.[102] Having concluded his analysis at step five, the ALJ found Plaintiff "not disabled" and accordingly denied his claims for a period of disability, disability insurance benefits and supplemental security income under Title II and Title XVI of the Act.[103]

In his motion for summary judgment, Plaintiff sets forth two arguments specifying why the ALJ committed reversible error in his decision.   Plaintiff first contends the ALJ's decision that Plaintiff is not disabled contradicts the RFC assessment because the ALJ acknowledges Plaintiff's absolute need for a walker and his further need to avoid all exposure to pulmonary irritants.[104]  Next, Plaintiff argues that the ALJ violated SSR 00-4p by not resolving the conflict between the Dictionary of Occupational Titles ("DOT") and the testimony of the VE.[105]  Specifically, Plaintiff contends that the jobs that the VE testified Plaintiff was capable of performing exceed Plaintiff's physical and emotional capacity.[106] Defendant, on the other hand, contends the ALJ employed proper legal standards in reviewing the evidence and that the ALJ's

---

[102]    Id.

[103]    Tr. 28.

[104]    Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment, Docket Entry No. 16, p. 4.

[105]    Id. at p.6.

[106]    Id.

decision is supported by substantial evidence.[107]   Defendant therefore maintains the ALJ's decision should stand.[108]

The court agrees with Plaintiff that the ALJ's decision is flawed, but for a different reason than that posed by Plaintiff. The court finds that there is not substantial evidence on the record to support the ALJ's hypothesis and his RFC assessment as it relates to Plaintiff's ability to stand.   Accordingly, the court remands this matter to the SSA so that a current physical RFC assessment of the Plaintiff can be administered.

RFC is a measure of what individuals can do despite the limitations that their physical and/or mental impairments impose.[109] The ALJ's decision sets forth Plaintiff's RFC, as follows:

> He can stand 30 minutes at a time for a total of six hours.  He can walk a few moments at a time for a total of one hour in an eight hour work day and sit 30 minutes at a time for a total of six hours in an eight hour work day.  The claimant can lift five pounds frequently and ten pounds occasionally.  He can never climb stairs, ropes, ladders, or scaffolds.  He can occasionally balance and occasionally stoop.  He cannot kneel, crawl, or crouch.  He needs to use a walker to ambulate.  Also, is limited to a simple routine work environment and only limited written instructions.  Due to chronic obstructive pulmonary disease, he cannot perform job tasks that require exposure to pollutants, dusts, gases, or mists.[110]

Although the ALJ concluded in his RFC assessment that Plaintiff is

---

[107]   Brief in Support of Defendant's Motion for Summary Judgment, Docket Entry No. 15, pp. 4-12.

[108]   Id.

[109]   20 C.F.R. § 404.1545(a).

[110]   Tr. 27.

capable of standing for six hours in an eight-hour day, the hypothetical posed to the VE limited Plaintiff's ability to stand to two hours in an eight-hour day.  Specifically, the ALJ posed the following hypothetical to the VE at the administrative hearing:

> [W]ould you assume for me an individual who could stand about two hours in an eight hour day with normal breaks limited to about 30 minutes at a time.  Walking up to one hour a day for a few moments at a time.  Sitting up to six hours a day for about 30 minutes at a time.  Lifting or carrying about 10 pounds occasionally and about five pounds frequently.  Never stairs, never ropes, ladders or scaffolding.  Occasionally balancing, occasionally stooping.  Never kneeling, never crouching, never crawling.  No exposure to dust, mist or gases, uses a walker to ambulate.  Mentally should be limited to a simple, routine work environment and written instructions should be limited.[111]

Based on the ALJ's RFC assessment and the VE's testimony, the ALJ concluded in his decision that Plaintiff could perform a significant range of sedentary work.[112]

Sedentary work requires the ability to lift no more than ten pounds at a time and occasionally lift or carry articles like docket files, ledgers and small tools.[113]  Sedentary jobs require an individual to stand occasionally, which is defined as "occurring from very little up to one-third of the time, and would generally total no more than 2 hours of an 8-hour workday."[114]   Social

---

[111]   Tr. 557.

[112]   Tr. 27.

[113]   SSR 96-9p.

[114]   Id.

22

Security Ruling 96-9p ruling states that the "impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50."[115]

The court finds that the portion of the ALJ's RFC assessment, which provides that Plaintiff is able to stand for six hours in an eight-hour day, is not supported by the substantial evidence on the record.  Furthermore, although the hypothetical question posed to the VE limits Plaintiff's ability to stand to two hours in an eight-hour day, the court is simply unable to determine how the ALJ came to this conclusion based on the evidence on the record.  The court likewise notes that the ALJ's decision fails to articulate the basis for his determination that Plaintiff is able to stand for six hours, as set forth in the RFC assessment, or for two hours, as set forth in the hypothetical posed to the VE.

First, the ALJ appears to base his conclusions in large part on a RFC physical assessment and a physical evaluation conducted in 2000, nearly four years prior to the March 2, 2004, administrative hearing.  The ALJ's decision relies in part on the physical RFC assessment conducted by Dr. E.R. Leggett, M.D. ("Dr. Leggett") on August 14, 2000.[116]  This assessment provides that Plaintiff is able to stand for about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, lift twenty pounds occasionally

---

[115]   Id.

[116]   Tr. 289-295.

and lift ten pounds frequently.[117]   The ALJ's decision also relies on the physical examination conducted by Dr. Staton on July 26, 2000.[118]   During her examination of the Plaintiff, Dr. Staton reports that he utilizes a back brace and cane, but "should be able to sit for short periods of time," "stand for short periods" and "walk short distances."[119]   There is simply not substantial evidence on the record to support the ALJ's determination that Plaintiff can currently stand for two hours (or for six hours), as the evidence on the record suggests that Plaintiff's physical limitations significantly deteriorated after these physical examinations were conducted in 2000.

Specifically, on November 2, 2001, Plaintiff presented to the VAMC with complaints of leg numbness and severe lower back pain radiating into the right leg.[120]   On November 29, 2001, the physicians at the VAMC determined that Plaintiff required a walker to aid him in ambulation.[121]   A kinesiotherapist at the VAMC documented that Plaintiff had been walking with a cane, that he was not functional with the cane and that he was able to walk one

---

[117]   Id.

[118]   Tr. 269-72.

[119]   Id.

[120]   Tr. 399.

[121]   Tr. 390.

24

hundred and fifty feet with a walker.[122]   The treatment note provides that a walker was ordered to assist Plaintiff in ambulation.[123]

Although the ALJ states in his RFC assessment and in the hypothetical posed to the VE that Plaintiff uses a walker to ambulate, the ALJ's decision provides that Plaintiff requested that a walker be ordered on his behalf on November 2, 2001.[124]  This is simply incorrect, as the evidence on the record indicates that Plaintiff's walker is medically necessary.  Social Security Ruling 96-9p states that, in order to find that a hand-held device is medically required, "there must be medical documentation establishing the need for a hand-held device to aid in walking or standing, and describing the circumstances for which it is needed[.]"[125]  This ruling further provides that "if a medically required hand-held device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded."[126]   The treatment notes suggest that Plaintiff's walker was a "medically necessary" hand-held device

---

[122]   Id.

[123]   Id.

[124]   Tr. 20.

[125]   SSR 96-9p.

[126]   Id.

that Plaintiff required at all times.  Accordingly, the ALJ appears to have ignored a critical factor in formulating the RFC assessment and the hypothetical posed to the VE.

In addition to the fact that a walker was prescribed to alleviate Plaintiff's pain when walking, there are other indications on the record that Plaintiff's lumbar spine condition worsened after 2000.  A radiology diagnostic report on December 5, 2001, showed minor degenerative changes in the lumbar spine.[127]  On December 11, 2001, a Five Axis DSM Diagnosis conducted at the MHMRA noted that Plaintiff was confined to a wheelchair due to his lower back pain.[128]  A treatment note dated August 21, 2003, indicated that Plaintiff's pain was not alleviated with motrin, naproxen and ultram, and that Plaintiff needed stronger medication.[129]  On March 1, 2004, a treatment note likewise indicated that the medication, sulindac, was not alleviating Plaintiff's lower back pain.[130]

Based on the medical evidence on the record, the court finds that there is not substantial evidence to support the ALJ's hypothetical or his RFC assessment with respect to the amount of hours that Plaintiff is able to stand.  The ALJ appears to rely primarily on an outdated physical RFC assessment in order to

---

[127]     Tr. 388.

[128]     Tr. 458.

[129]     Tr. 512.

[130]     Tr. 504.

formulate Plaintiff's RFC and appears to neglect evidence on the record that indicates that Plaintiff's condition worsened considerably between the period of 2001 to 2004. Accordingly, the court remands this matter to the SSA so that the Plaintiff can undergo a current RFC physical assessment in order to determine whether Plaintiff is capable of performing sedentary work. Based on the foregoing, the court **DENIES** Defendant's motion for summary judgment and **DENIES** Plaintiff's cross- motion for summary judgment.

### IV. <u>Conclusion</u>

For all of the foregoing reasons, the court **DENIES** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Cross-Motion for Summary Judgment. The court further remands this matter to the SSA so that a current RFC assessment of the Plaintiff can be administered.

SIGNED at Houston, Texas, this 9th day of December, 2005.

Nancy K. Johnson
United States Magistrate Judge

27